UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| JOHNATHAN IRISH | ) | |
| | ) | |
| v. | ) | 1:16-cv-70-PB |
| | ) | |
| UNITED STATES OF AMERICA | ) | |

UNITED STATES' POST-HEARING MEMORANDUM

I.    INTRODUCTION.

On the day that trial evidence was to begin, Defendant Johnathan Irish pleaded guilty to

two counts, making a false statement to a federal officer (18 U.S.C. § 1001) and aiding and

abetting the straw purchase of a firearm (18 U.S.C. § 922).  As a result of his plea, the defendant

received an essentially time-served sentence.

The defendant has now filed a timely motion to vacate his convictions under 28 U.S.C.

§ 2255, in which he represented himself.  After a two-day hearing, it appears that the defendant

makes two arguments.  First, he claims that he was coerced into pleading guilty because the

United States Attorney allegedly told his girlfriend's (now wife's) lawyer that if he did not plead

guilty that his girlfriend would be prosecuted.  Therefore, he says he pleaded guilty only to save

her from prosecution.  Second, he says that his lawyers ineffectively advised him to plead guilty

because his lawyers failed to appreciate that: (1) there was a meritorious motion to dismiss based

on government misconduct; (2) the § 1001 charge was defective because the alleged false

statement was immaterial and was not made pursuant to a matter with the jurisdiction of the

executive branch of the federal government; and (3) the impeachment of his girlfriend's prior

testimony was so powerful that the jury was going to acquit him on the straw purchase charge

after hearing this impeachment.

It bears noting at the outset the defendant's claims are inherently inconsistent.  If the defendant's testimony is to be believed, he pleaded guilty because of coercion from the United States Attorney.  If that is so, the failure of his counsel to advise him to litigate his case is irrelevant since he did decide to plead based, not on their advice, but rather because of his desire to save his girlfriend from prosecution.

Even if the defendant's arguments are considered entirely independently from one another, his claims fail.  Under First Circuit law, informing a defendant of possible adverse consequences to a family member if he does not plead guilty fails to render a plea involuntary. In any event, the defendant's statement at his § 2255 hearing that he was coerced because of threats to his girlfriend is entirely inconsistent with his sworn testimony at his change of plea hearing, where he expressly disavowed any threats or coercion. The defendant's contrary claims now should be rejected, especially given his testimony on cross-examination that he is motivated currently by the desire to be free of the restriction on his possession of firearms (having already received the benefit of a time-served sentence).

The defendant's second argument is equally unavailing.  The supposed government misconduct, the alleged defects in the § 1001 charge or the alleged strong impeachment of his girlfriend were not so powerful, either independently or collectively, that it was ineffective for the defendant's lawyers to advise the defendant to forego these claims in favor of a binding plea agreement to an essentially time-served sentence.

II.    THE DEFENDANT'S PLEA WAS NOT COERCED.

"It is elementary that a coerced plea is open to collateral attack."  Fontaine v. United States, 411 U.S 213, 214 (1973).   "A guilty plea is involuntary and therefore invalid if it is

obtained by actual or threatened physical harm or by coercion overbearing the will of the defendant." United States v. Martinez-Molina, 64 F.3d 719, 732 (1st Cir. 1995).

The defendant claims that he was prepared for trial but decided to plead guilty based on indirect coercion applied to him by the United States Attorney. The defendant says that, the night before evidence was to begin, he received a telephone call from his girlfriend. She told him that her lawyer (she was independently represented because her testimony at the trial could have incriminated her) had told her that the United States Attorney said that if he did not plead guilty, she would be prosecuted. The defendant says this threat caused him to change his mind and to contact his lawyers first thing the next morning to indicate that he wished to plead guilty.

Even assuming that this version of events is true (which the government disputes below), the argument fails. In Bordernkircher v. Hayes, 434 U.S. 357, 364 n. 8 (1978), the United States Supreme Court reserved the question of whether "the offer during plea bargaining of adverse or lenient treatment for some person *other* that the accused" could render an individual's plea involuntary. The First Circuit has since held that "such arrangements do not render an individual's plea involuntary." United States v. Mescual-Cruz, 387 F.3d 1, 7 n.1 (1st Cir. 2004). "If a defendant elects to sacrifice himself to protect someone close to him that is his choice and he cannot reverse it after he is dissatisfied with his sentence or with other subsequent developments." Id. at 7-8; United States v. Buckley, 847 F.2d 991, 1000 n.6 (1st Cir. 1988).

This legal principle defeats the defendant's claim. Even if the United States Attorney had said that the government would proceed to prosecute the defendant's girlfriend, the defendant's decision to plead guilty to avoid this fate for his girlfriend was his choice. He cannot complain now if this was one of the considerations that led to his decision to plead guilty.

While a defendant can plead guilty to avoid an adverse consequence to another person, a district court which expects such a consideration is in play should take special care to make sure that the plea is voluntary.  <u>Buckley</u>, 847 F.2d at 1000 n.6.  The district court engaged in precisely this practice:

| | |
|---|---|
| THE COURT: | Has anyone threatened you in an effort to try to get you to plead guilty? |
| THE DEFENDANT: | No, your Honor. |
| THE COURT: | So we've had some discussions in the past about maybe threats against family members or girlfriend or common law wife, things like that.  Has anybody threatened you in that way to try to get you to plead guilty to this particular plea agreement? |
| THE DEFENDANT: | No, your Honor. |

* * *

| | |
|---|---|
| THE COURT: | All right.  Has anyone made any other promises to you in an effort to try to get you to plead guilty other than the ones that are in this written plea agreement that we talked about? |
| THE DEFENDANT: | No promises, just that no charges would be brought forth on my wife. |
| THE COURT: | So it's not a condition of this plea agreement, but you have been told that they weren't going to bring some charges against your wife?  Is that what your telling me? |
| THE DEFENDANT: | Yes. Your Honor. |
| THE COURT: | Does the government have any current intention to bring charges against the wife in connection with these matters? |
| MR. KACAVAS: | No current intention, your honor. |

These representations defeat the defendant's argument here.  The defendant disavowed the contention that he had been coerced to plead in order to save his girlfriend from prosecution. The defendant did tell the court that he understood that his girlfriend would not be prosecuted.

4

The court clarified that this was not a condition for the plea but just a decision that was made by the government.  Thus, the defendant, at the change of plea, clearly understood that a decision had been made not to prosecute the girlfriend but he (confirmed by the prosecutor) understood that this was the government's independent decision and not a condition of the plea.

It is well settled that a court "will not permit a defendant to turn his back on his own representations to the court merely because it would suit his convenience to do so."  United States v. Parrilla-Tirado, 22 F.3d 368, 373 (1st Cir. 1994).  Thus, a defendant "should not be heard to controvert his Rule 11 statements . . .  unless he [has] offer[ed] a valid reason why he should be permitted to depart from the apparent truth of his earlier statement[s]."  United States v. Butt, 731 F.2d 75, 80 (1st Cir. 1984).

The defendant has not offered any reason here.  He just says now that his girlfriend called him in a panic on the evening before trial to tell him that she would be prosecuted if he did not plead.  Even though the defendant called his girlfriend (now wife) to testify at the § 2255 hearing, he did not even inquire of her whether this conversation took place.  Rather, he waited until he testified after her to spring this claim on the court.

His cross-examination testimony makes clear his motive for changing course from his change of plea.  At the sentencing hearing, the defendant made clear that his number one concern (understandably) was to get out of jail.  When the court asked the defendant if he wished to say anything before sentence was pronounced, the defendant responded, "Just as long as I can go home tomorrow, your Honor."

The defendant did go home.  But now that he has received this benefit, the defendant is left only with the collateral consequences of his conviction, including the ban on his possession of firearms.  As the defendant testified, he cannot obtain the employment he wants because it

involves working with guns.  Thus, the defendant has decided to change his version of events from the change of plea in the hopes of getting back his guns.  This court should reject the defendant's obvious attempt to escape from his voluntary plea because he does not like the collateral consequences of his choice.

In sum, even assuming that the defendant pleaded guilty to save his girlfriend from prosecution, his plea was still voluntary because it was the defendant's choice to sacrifice himself to save her.  But in any event, the defendant's plea and sentencing transcripts show otherwise.  The defendant pleaded guilty because it was the best way that he could assure himself of an expeditious exit for prison.  Having received the benefit of that bargain, he should not be allowed to walk away from it now.

III.   THERE WAS NO INEFFECTIVE ASSISTANCE OF COUNSEL
       IN ADVISING THE DEFENDANT TO PLEAD GUILTY.

The defendant's second (and as noted supra inconsistent) theory for § 2255 relief is that his lawyers (Lawrence Vogelman and Kirk Simoneau) were ineffective in advising him to plead guilty in exchange for the essentially time-served disposition. The defendant posits that they were ineffective because (1) he could have prevailed on a motion to dismiss based on prosecutorial misconduct; (2) the § 1001 charge was legally and factually defective; and (3) he would have prevailed at trial on the straw purchase count because the cross-examination of his girlfriend's prior statement would have been overwhelmingly strong.

To succeed on a claim that the defendant received ineffective assistance of counsel based on pre-plea advice, the defendant must show: (1) counsel's performance in advising him to plead guilty fell below the standard of performance of reasonable proficient counsel and (2) the counsel's adequate performance induced the defendant to enter a guilty plea he would not have

6

otherwise entered.[1]   Applying this test requires a highly deferential judicial scrutiny of counsel's performance and a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  United States v. Dunfee, 821 F.3d 120, 128 (1st Cir. 2016).

The defendant says that his lawyers should have dissuaded him from pleading guilty on the basis that it would have been a better strategy to purse a motion to dismiss based on vindictive prosecution.  The defendant asserts misconduct on the ground that the FBI began the investigation into him because he complained about a DCYF official who was related to an FBI agent.  The defendant does not, however, claim that the United States Attorney's decision to indict was based on retaliation; rather he limits his claim to the initiation of the investigation by the FBI.

A prosecutor enjoys broad discretion in determining whom to prosecute for what crime and such pretrial decisions are presumed to be legitimate.  Bordenkircher, 434 U.S. at 364.  It violates due process, however, for a prosecutor to penalize an individual for exercising a statutory or constitutional right.  United States v. Jenkins, 537 F.3d 1, 3 (1st Cir. 2008).  Thus, a court may dismiss an indictment based on proof of vindictiveness.  United States v. Sanders, 211 F.3d 711, 716 (2d Cir. 2000).  To establish vindictiveness, a defendant must show that the prosecutor harbored genuine animus toward him and that he would not have been prosecuted but for that animus.  United States v. Wilson, 262 F.3d 305, 314 (4th Cir. 2001).

---

[1]   This second prong cannot possibly be satisfied based on the defendant's own testimony. At the evidentiary hearing, the defendant testified that he pleaded guilty because he wanted to save his girlfriend from the alleged threatened prosecution.  Assuming that the defendant testified truthfully to this Court, his counsels' representations on his chances of successfully fighting the charges is beside the point since it still would have led to the result he wanted to avoid – the prosecution of his girlfriend.

The defendant's claim (unlikely as it may be on the facts) does not support his claim, even assuming it is true.[2]  A vindictive prosecution claim requires that the defendant connect "any vindictive animus to those making the challenged charging decisions".  United States v. Bucci, 582 F.3d 108, 114 (1st Cir. 2009).

The defendant makes no claim that the decision by Assistant United States Attorney Nick Abramson to seek an indictment for the grand jury against him was based on Abramson's desire to punish the defendant for his complaints about a DCYF employee.  He also does not claim that the agents (who he accuses of retaliation) in any way interfered with or manipulated the charging decision.   The Seventh Circuit has rejected a claim similar to the defendant's, concluding that, even if the defendant could convince the court that the agents desired to retaliate against him, he did not show "these agents had any influence on the bringing of the prosecution." United States v. Goulding, 26 F.3d 656, 662 (7th Cir. 1994).  Thus, here, the defendant's claim that his indictment should have been dismissed for prosecutorial vindictiveness was not likely to succeed because there was no evidence of vindictiveness by the prosecutor on the case.  Therefore, it was appropriate for the defendant's lawyers to recommend obtaining the benefits of a plea rather than litigating the matter further.

At his hearing, the defendant also suggested outrageous government conduct as a basis for dismissal based on an FBI special agent threatening his girlfriend during an interview about the case.  "In rare and extreme circumstances, a federal court has the authority to dismiss criminal charges as a sanction for government misconduct." United States v. Guzman, 282 F.3d

---

[2]     The records show that DCYF had initiated proceedings while the defendant's baby was in the hospital after being born.  The defendant called out for help from militia members and there were bomb threats made to the hospital.  These threats led to an investigation into the defendant's conduct which did not yield fruit.

56, 59 (1st Cir.2002). That power must be used "sparingly," however, and is "reserved for only

the most appalling and egregious situations." Id.  A defendant invoking an outrageousness

defense therefore has a high hurdle to surmount; indeed, although the First Circuit has confirmed

the theoretical viability of the defense, it has never dismissed criminal charges on the basis of

outrageous government misconduct. United States v. Luisi, 482 F.3d 43, 59 (1st Cir.2007).  A

defendant claiming government misconduct must demonstrate that the government has engaged

in conduct "so appalling and egregious as to violate due process by 'shocking ... the universal

sense of justice.'" Id.

The defendant has not come close to producing evidence sufficient to meet this standard.

The defendant presented testimony from his girlfriend that she felt that the FBI special agent was

pressuring her to answer questions in ways that would support the government's case.  Her

testimony was general in nature and there was no testimony that she actually changed her

statements because of the pressure.  Moreover, the defendant's girlfriend (now wife) was

obviously motivated in her testimony to help the defendant based, on her own cross-examination

testimony, that his inability to have firearms was interfering with his ability to work.  Based on

the stringent legal standard for an outrageous government misconduct claim and the weak factual

predicate presented here, the defendant has failed to show that there was ineffective assistance of

counsel in advising him to plead guilty rather than pursuing a motion to dismiss based on

outrageous government conduct. Hill v. Lockhart, 474 U.S. 52, 59 (1985) (noting that Strickland

inquiry in advice-to-plea case is based "largely on whether the affirmative defense likely would

have succeeded at trial").

The defendant's arguments about his § 1001 claim fare no better.  He says that the charge

was legally flawed because he made the false statement to an FBI special agent over a matter that

was not within the jurisdiction of the executive branch of the federal government.  He also says that the charge was factually flawed because the statement he made to the FBI special agent was not material to any matter within federal jurisdiction.

A conviction under § 1001 requires the government to prove (1) a statement, (2) falsity, (3) materiality, (4) knowledge and (5) jurisdiction.  United States v. Notarantonio, 758 F.2d 777, 785 (1st Cir. 1985); United States v. Atalig, 502 F.3d 1063, 1066 (9th Cir. 2007).  In 1996, Congress amended the jurisdictional element of § 1001.  The law previously required that the false statement be "within the jurisdiction of any department or agency of the United States," 110 Stat. 3459. The amendment broadened the statute to cover any matter "within the jurisdiction of the executive, legislative or judicial branch of the Government of the United States.  110 Stat. at 3459.  This broad language means that a matter is within the jurisdiction of the executive so long as the executive branch "has the power to exercise authority in a particular situation."  Atalig, 502 F.3d at 1068.  Jurisdiction in this context "should not be given a narrow or technical meaning."  United States v. Jackson, 608 F.3d 193, 196 (4th Cir. 2010).

Here, the FBI was investigating the defendant for, inter alia, being a dealer in firearms without a license, a federal offense under 18 U.S.C. § 922(a)(1).  In February 2012, the FBI received information from an individual that the defendant was intending to build an assault rifle for his brother-in-law.  See FBI 302 dated February 16, 2012, attached as Exhibit A.  On February 15, 2013, an FBI confidential source indicated that the defendant had stated that he would be in a position to sell him an AR-15 in approximately three weeks.  See FBI 302 dated February 19, 2013, attached as Exhibit B.   Thus, prior to the defendant's false statement on February 28, 2013, the FBI had information that the defendant was building firearms to sell to other people.  Accordingly, there was a sound basis for executive branch jurisdiction (through

the FBI) to investigate the defendant for unlawfully selling firearms. United States v. Carter, 801 F.2d 78 (2d Cir. 1986) (stating that violation of the statute may be based on a few unlicensed sales).

The defendant's false statement was directly related to this ongoing investigation. The local police had visited the defendant to determine whether the defendant was possessing firearms in violation of a New Hampshire restraining order. The defendant told the officer that he had sold his firearms to an individual named Tony. The FBI met with the defendant after learning about this statement. The defendant again indicated that he sold the guns in his possession to Tony. This statement was obviously pertinent to the FBI investigation into whether the defendant was dealing in firearms, a matter within the jurisdiction of the executive branch of the federal government. Accordingly, the defendant's lawyers were not ineffective for advising him to plead guilty rather than proceeding with a motion to dismiss the § 1001 charge for a lack of executive branch jurisdiction.

The defendant also says that his lawyer should have advised him to proceed with a trial on the § 1001 charge because he had a meritorious defense on the ground that his false statement about selling guns to Tony was immaterial. United States v. Newell, 658 F.3d 1, 17 (1st Cir. 2011) (defining materiality under § 1001 as having a tendency to influence a government decision). The statement was obviously material to the FBI investigation. The FBI was investigating the defendant for dealing in firearms and the defendant (who did not know at the time that he was under investigation for this offense) admitted that he had sold firearms to another person. This statement was obviously pertinent to the investigation and was relevant to the government's decision on how to proceed. Therefore, a materiality defense was no sure

thing (indeed, it was a sure loser).  Accordingly, it was sound advice for the defendant's lawyers to urge him to plead guilty instead of pursuing a materiality defense at trial.

Finally, the defendant claims that his lawyers should have urged him to take the straw purchase claim to trial because there was a sound basis to impeach his girlfriend's prior testimony that she had lied on the firearm purchasing form in order to buy a receiver for the defendant.  The defendant's argument overlooks the other evidence that very well could have convicted him even assuming that the jury disregarded the girlfriend's prior statements.

The defendant, in recorded statements, told a cooperating source that he had just purchased a receiver with his own funds to build a gun.  September 21, 2013 Transcript, Exhibit C.  In addition, there was evidence that the defendant was in the process of building a firearm for an FBI undercover agent and this receiver was a necessary piece to build the gun and that gun was, in fact, sold to the FBI undercover.  The defendant therefore had a motive to obtain the receiver quickly which would be facilitated if he could avoid a background check by having someone else buy the gun.

In short, while the jury discrediting the defendant's girlfriend's prior statements was necessary for him to put on a factual defense that his girlfriend was buying the receiver for herself, it would not have necessarily been sufficient.  There was other evidence, including the defendant's own statement, that he had bought the receiver for himself.  In these circumstances, the defendant's lawyers provided reasonable professional advice to plead guilty, even assuming that there possibly was strong impeachment of his girlfriend's prior testimony.

IV.    CONCLUSION.

For the reasons stated, the defendant received sound professional counsel to plead guilty to achieve the benefit he wanted -- the sure and soon release from prison despite the very strong

evidence of guilt and substantially higher sentencing exposure.  The defendant made that decision knowingly, voluntarily and intelligently.  There is no basis for allowing the defendant to change his mind now.  Accordingly, this Court should deny the defendant's § 2255 motion.

Respectfully submitted,

EMILY GRAY RICE
United States Attorney

August 16, 2016                          /s/  Seth R. Aframe
                                         Seth R. Aframe
                                         N.H. Bar No. 643288
                                         Assistant U.S. Attorney
                                         53 Pleasant St., 4th Floor
                                         Concord, NH 03301
                                         603-225-1552

**CERTIFICATE OF SERVICE**

        I hereby certify that on this date, a copy of the government's memorandum has been served via U.S. Mail upon Johnathan Irish, 311 Lyndeboro Road, New Boston, NH 03070.


                                         s/ Seth R. Aframe
                                         Seth R. Aframe
                                         Assistant United States Attorney